H. H. MacDonaugh & Co., The Mutual Supply Co. *v.* United States (No. 4631)[1]

---

[1] C. A. D. 436.

United States Court of Customs and Patent Appeals, June 30, 1950

Lawrence, Tuttle & Harper (George R. Tuttle of counsel) for appellants.

David N. Edelstein, Assistant Attorney General (Joseph F. Donohue and Alfred A. Taylor, Jr., special attorneys, of counsel), for the United States.

Lamb & Lerch (David A. Golden and John G. Lerch of counsel), amicus curiae.

[Oral argument April 12, 1950, by Mr. Tuttle, Mr. Donohue, and Mr. Lerch

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the First Division of the United States Customs Court rendered in conformity with its decision Reap. Dec. 7701, 22 Cust. Ct. 446, in Reappraisement 137396–A,

affirming the judgment of the single judge, Reap. Dec. 6559, 17 Cust. Ct. 442, sustaining the appraised value (based upon American selling price) applied by the local appraiser to a shipment of rubber-soled canvas-top shoes exported from Japan May 14, 1940, and entered at the port of Los Angeles, California, June 6, 1940. The entry was made "under duress" to meet valuation advances made by the local appraiser in cases said to be similar.

The shoes in sizes of 4, 4½, and 5, packed in cases, were invoiced at 13.92 yen per dozen pairs; in sizes 5 and 6, packed in cases, at 14.28 yen per dozen pairs; and in size 7, packed in cases, at 14.40 yen per dozen pairs. The appraised values are $1.22 per pair, less 3 per centum, for sizes 4, 4½, and 5, and $1.32 per pair, less 3 per centum, for sizes 6 and 7.

The bases of the appraisements appear to have been the selling prices of domestic canvas-top rubber-soled shoes manufactured by the United States Rubber Company, designated as MK 659 for men's sizes and BK 659 for boys' sizes.

In the summarization in the concluding paragraph of the brief before us on behalf of appellants, it is contended that, for the reasons theretofore urged in the brief filed in support of the assignments of error, the judgment should be reversed and the case remanded with directions to find dutiable value "in accordance with the provisions of section 402 (c) (foreign value), 402 (d) (export value), 402 (e) (United States value) or 402 (f) (cost of production)."

The appraisement at the American selling price was made by the local appraiser under section 402 (g) of the Tariff Act of 1930, which reads:

SEC. 402. VALUE.

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

Utilization of the American selling price is authorized by section 336 of the Tariff Act of 1930, the here pertinent provisions of which read:

SEC. 336. EQUALIZATION OF COSTS OF PRODUCTION.

(a) CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission

there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

(b) CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402 (g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

(c) PROCLAMATION BY THE PRESIDENT.—The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

Under the authority of section 336, *supra*, the United States Tariff Commission conducted an investigation (apparently applied for August 17, 1932, by Rubber Mfgs. Association Inc., 250 West 57th St., New York, N. Y.) respecting the differences in the domestic and foreign costs of production of footwear having rubber as a component part, the investigation including shoes of the type, or class, to which those here involved belong, and reported to the President, in substance, that an equalization of costs of production of such shoes (classifiable under paragraph 1530 (e) of the Tariff Act of 1930 and dutiable at 35 per centum ad valorem) required the calculation of such duty upon the basis of American selling price as defined in section 402 (g), *supra*.

The findings of the Commission were transmitted to the President on January 31, 1933. On the following day the President issued a proclamation reported as T. D. 46158, published in 63 Treas. Dec. 232, putting into effect the findings of the Commission.

The validity of the President's proclamation has not been questioned in this proceeding, nor has there been any challenge respecting the validity of the action of the Tariff Commission. Appellants'

challenge is leveled at the appraisement made by the local appraiser at the port of Los Angeles, which appraisement the respective tribunals of the Customs Court sustained.

It is argued on behalf of appellants that the domestically manufactured shoes, identified by the designations "MK 659" and "BK 659," are not within the scope of the President's proclamation because shoes so identified were not in existence at the time the Tariff Commission made its investigation and report, upon which report the proclamation was based.

It is shown by the record, as, in effect, was held below, that shoes designated as "MK 659" and "BK 659" were first offered for sale February 1, 1935. Just when they were actually manufactured is not definitely shown, but there is no contention that they were in existence at the time the Tariff Commission made its investigation.

However, it is not controverted that there were in existence at the time of the Commission's investigation articles presumably classifiable, as are those here involved, under the phraseology of paragraph 1530 (e) of the Tariff Act of 1930, reading:

* * * shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other materials, * * *

nor is it questioned that such shoes as have "uppers" composed of the materials named fall within the designation "canvas-top," although the term "canvas-top" is not used in the statute.

During the trial of the case no evidence was introduced relative to the particular meaning of the terms "MK 659" and "BK 659"— that is, no effort was made to show whether they were trade-mark terms, brand terms, or terms of some other character. That they are not statutory terms is obvious. So far as we can discern, the case was proceeded with upon the theory that they were "brand" terms used by the manufacturer for convenience in listing prices to be used in making sales.

However that may be, we agree with the rulings of the single judge and the appellate division of the Customs Court expressed in the decision of the latter as follows:

The Tariff Commission investigated the cost of production of American rubber-soled, canvas-top shoes—not certain styles, specific brands, or particular shoes. They investigated a general class or type of shoe, including, among others, those with rubber soles and canvas tops. Likewise, it was the cost of production of a "class or kind" of shoe as a whole, in the principal competing countries, that was found to be unequal to the domestic cost of production. It was as to such class that the Presidential proclamation herein was issued. Whether or not there was a particular brand or style of shoe in existence is immaterial so long as the shoe comes within the class or kind covered by the investigation and falls within the description given in the proclamation.

In the course of its discussion of this phase of the controversy, the appellate division of the Customs Court cited a number of decisions, including decisions of this court in the cases of *United States* v. *General Dyestuff Corp.*, 19 C. C. P. A. (Customs) 410, T. D. 45577; and *Union Fork & Hoe Co.* v. *United States*, 24 C. C. P. A. (Customs) 199, T. D. 48656.

We have examined the several decisions so cited. The facts presented in the instant case differ in some respects from the facts presented in those cases, but the general principle declared in the *General Dyestuff Corp.* case, *supra*, and the *Union Fork & Hoe Co.* case, *supra*, has an application here.

If the theory here advanced on behalf of appellants should be declared the law, obviously the power would be placed in the hands of exporters of merchandise from foreign countries to nullify, or at least render largely ineffective, the American selling price provision. Such exporters could accomplish this by the simple expedient of creating new trade or brand names, numbers, or designations for application to articles differing slightly in shape, but not different in any essential substance or form from articles which were in existence at the time of the investigation by the Tariff Commission and the issuance of the President's proclamation.

Another argument on behalf of appellants is made in the brief under the heading, "The market was not bona fide."

· The substance of the argument seems to be that at the time of the importation here involved (June 6, 1940) a market existed for the imported shoes and that

\* \* \* Since appraisement on the basis of the American selling price had already been established by Presidential proclamation, the United States Rubber Company was in a position in 1935 to fix a selling price for their product that would enable said company to invade the market that already existed, perhaps capture it, and possibly drive the foreign article out of it. To this end the company manufactured a shoe apparently like or similar to the foreign article and fixed a selling price which, if accepted, would require the foreign article to pay an extremely heavy duty.

The United States Rubber Company representative stated that this was done to "meet competition," but this is not so. The foreign product was being sold on the West Coast and the Rubber Company product was not. Therefore, the real purpose was to fix the amount of duty to be paid by the foreign article and to capture, if possible, that market.

. Relative to the argument so made, we may point out that it was evidently the purpose of the Congress, as expressed in the various statutes, to favor United States industries, and, in the exercise of its unquestionable authority, it passed the laws under which, and subject to which, the merchandise here involved was imported.

The fact that there had been established on the West Coast, with San Francisco, California, as the principal market, a market for Japanese made canvas-top, rubber-soled shoes (of a type used

mainly—the meagre record indicates—by truck farmers, or vegetable growers in that region) certainly should not have prevented United States producers of similar shoes from entering the market. Whether the United States producers should have been favored by law so that they might capture the market "and possibly drive the foreign article out of it" was a question of policy to be determined by legislative—not judicial—authority.

Another insistence on behalf of appellants, urged with much vigor, is, in substance, that there is no substantial evidence to support the finding that "American Selling Price" as defined in section 402 (g), *supra*, of the Tariff Act of 1930 is applicable here.

The allegation so made makes proper an analysis of section 402 (g), wherein the Congress gave the definition of "American Selling Price" which it intended should be applied in the administration of the customs laws.

There are really two definitions. The first embraces the phrase "freely offered for sale," which long has been used in tariff acts in defining (1) foreign value, (2) export value, and (3) United States value. (See paragraphs (c), (d), and (e) of section 402 of the Tariff Act of 1930.) The phrase as so used has been construed often and need not be discussed here.

The second definition is alternative. It is embraced in the clause reading, "or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article."

So far as we have been able to ascertain, the last clause quoted appeared for the first time in section 402 (f) of the Tariff Act of 1922. Obviously, it is a very broad provision, evidently inserted to supplement the first provision in a manner favorable to domestic industries.

In the brief for appellants there is little discussion of the latter provision, the emphasis being placed upon the alleged lack of any substantial evidence to support the requirement that the article be "freely offered for sale for domestic consumption to all purchasers," etc.

It so frequently has been held during so many years that this court's jurisdiction in reappraisement proceedings is limited to consideration of "a question or questions of law only" (see section 501, Tariff Act of 1930) that no discussion of that rule is necessary here, nor is there any necessity for citing authorities. Also it is settled, by a long line of decisions, that the question of whether there is "any substantial evidence" is a question of law, but this does not include an authority on our part to weigh the evidence or to pass upon the credibility of witnesses.

To state the matter in simple terms: Where the appellate division of the Customs Court, from the decisions of which appeals in reappraisement proceedings come to us, makes a finding, or findings, of fact, it is assumed by us that the evidence has been weighed by such division, and, even though we might not entertain the same view relative to the weight of the evidence as that manifested in the appellate division's decision, we do not regard this court as having authority to reverse on that ground.

We have carefully examined the evidence presented in this case.

The witness called by counsel for appellants (the Government called no witnesses) whose testimony is of most importance, as we view it, was Charles W. Pennington who stated that since 1940 he had been "Pacific Coast sales manager of the footwear and clothing division of the United States Rubber Company," a manufacturer of shoes such as those with which the imported shoes were compared by the local appraiser, and that prior to 1940 he had been connected with that company in other of its activities at different places on the Pacific Coast.

From Pennington's testimony, it is apparent, we think, that the company which he represented was not actually *trying to sell*, in the region of which San Francisco was the principal market, shoes of the type here involved to any concerns other than retailers. In all the Pacific Coast region the company had just one jobber customer. It was located at Sacramento, California. There were other jobbers in the region. There is no evidence showing that salesmen called upon such jobbers, or that their patronage was sought by mail, or in any other manner, but, on the other hand, there is no evidence that any jobbers ever sought to become customers, or that the United States Rubber Company ever received an offer from any concern to purchase which it refused.

Certainly all the pertinent testimony of Pennington and other witnesses is to the effect that the United States Rubber Company would have been "willing to receive" the list prices of the shoes (allowing discounts as is customary in business transactions) "sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article."

In the view which we take of the case, we deem it unnecessary to quote from or paraphrase the testimony.

We do not think the contention made on behalf of appellants to the effect that there is no substantial evidence to support the findings of the appellate division properly may be sustained.

The judgment appealed from is *affirmed.*